Producers Realty Corp. v. Commissioner.
Producers Realty Corp. v. Commissioner
Docket No. 89851.
United States Tax Court
T.C. Memo 1962-162; 1962 Tax Ct. Memo LEXIS 145; 21 T.C.M. (CCH) 900; T.C.M. (RIA) 62162; June 29, 1962
George M. Mott, Esq., 632 Illinois Bldg., Indianapolis, Ind., for the petitioner. George H. Becker, Esq., for the respondent. FORRESTER
Memorandum Opinion FORRESTER, Judge: Respondent determined deficiencies in petitioner's income tax for the taxable years 1957 and 1958 of $6,000.34 and $5,275.90, respectively. The only issue is whether certain payments to petitioner were interest, thereby subjecting it to the personal holding company tax imposed by section 541 of the Internal Revenue Code of 1954. [1]
All of the facts have been stipulated and are so found. Petitioner *147 is a corporation incorporated under the laws of the State of Indiana on March 1, 1948, and has its principal office in Indianapolis, Indiana. It filed its Federal income tax returns for the taxable years 1957 and 1958 with the district director of internal revenue at Indianapolis, Indiana. During the taxable years involved herein petitioner kept its books on an accrual basis but filed its income tax returns for such years on the cash basis. In petitioner's Articles of Incorporation, as filed with the secretary of state of the State of Indiana, the following corporate purposes are among those enumerated: 2. The purpose or purposes for which it is formed are as follows: (a) To engage in the business of buying, holding, leasing, mortgaging, and/or selling of real estate and to engage in the business of property management including the erection of improvements on undeveloped real estate; (b) To acquire, own, hold, use, lease, mortgage, pledge, sell or otherwise dispose of property, real and personal, tangible and intangible; * * *
(f) And to do any and all other acts as may be necessary or expedient and not inconsistent with the purposes hereinbefore set out. Petitioner's *148 incorporators were: Salvatore M. LaRosa, Phillip J. Caito, Rosario E. Romano, Phillip Caito, Jr., Cosmas A. Mascari, Gus Comella, John M. LaRosa, Salvatore Mazza, John B. Caito, Joe Murello On or about June 16, 1949, there was organized under the laws of the State of Indiana a corporation known as Indianapolis Produce Terminal, Inc., hereinafter referred to as Terminal. The incorporators of Terminal were: Gus Comella, Phillip J. Caito, Joe Murello, Phillip Caito, Jr., Salvatore T. Miceli, John M. LaRosa, John B. Caito, Rosario E. Romano, Salvatore Mazza, Cosmas A. Mascari, Salvatore M. LaRosa, Paul T. Rochford Petitioner, by warranty deed dated January 15, 1954, conveyed a tract of real estate which it owned to Terminal. This realty, containing approximately 67.49 acres, was conveyed in exchange for 16,500 of the 30,000 authorized shares of the Class "A" common stock of Terminal, which 16,500 shares petitioner held throughout the years 1957 and 1958. From the time petitioner transferred the 67.49 acres of real estate to Terminal, it loaned money to Terminal. Account Number 125 of petitioner, entitled "Notes Receivable, Indianapolis Produce Terminal," had the following balances *149 as of December 31, 1956, December 31, 1957, and December 31, 1958: Date
Balance
December 31, 1956
$493,956.98
December 31, 1957
358,856.98
December 31, 1958
370,106.98 The aforementioned amounts were covered by a note from Terminal to petitioner bearing interest at 7 percent. The minutes of the meeting of the directors of petitioner dated November 7, 1953, indicated that as of that date petitioner had advanced substantial sums of money to Terminal. Account Number 120 of petitioner entitled "Interest Receivable from Terminal" had the following balances as of December 31, 1956, December 31, 1957, and December 31, 1958: Date
Balance
December 31, 1956
$ 87,320.90
December 31, 1957
100,727.02
December 31, 1958
109,585.01
After Terminal acquired the real estate from petitioner, it obtained a mortgage on such property on December 22, 1953, [2] from Dovenmuehle, Inc., 135 South LaSalle Street, Chicago, Illinois. Petitioner became a comortgagor on said mortgage. The funds from this mortgage were used by Terminal to construct a terminal warehouse. *150 On December 8, 1954, there was recorded in the office of the recorder, Marion County, Indiana, a mortgage by Terminal to petitioner in the amount of $428,516.05. A release of this mortgage, dated April 18, 1956, was filed with the recorder of Marion County on May 1, 1956. Throughout the taxable years 1957 and 1958 more than 50 percent in value of petitioner's outstanding stock was owned, directly or indirectly, by or for not more than 5 individuals. Petitioner reported gross income for the taxable years 1957 and 1958 as follows: 1957
1958
Interest
$18,476.46
$16,521.02
Rents
5,465.18
3,901.09
Miscellaneous
43.81
100.00
Total
$23,985.45
$20,522.11
Respondent contends that petitioner is a personal holding company as defined in section 542(a) [3] and is therefore subject to the personal holding company tax imposed by section 541. [4] He argues that over 80 percent of petitioner's income constituted interest and rents, [5] and that such rents constituted less than 50 percent of petitioner's gross income during each year. The parties have stipulated that the stock ownership requirement of section 542(a)(2) has been met. *151 Petitioner cites no authorities, but makes a "substance over form" argument on brief, excerpts from which follow: Looking at what happened in substance, rather than form, it appears that petitioner financed and caused to be erected on real estate which it owned a terminal warehouse which was transferred to Terminal. Had not the title to the real estate been transferred prior to the time the improvement was built thereon, there would be no question but that the amount owing to petitioner by Terminal would be for the purchase price of the terminal property. Since, however, each corporation had the same management, title to the real estate was transferred to Terminal before the building was erected. * * * Had the petitioner built the terminal building without the intervention of the subsidiary corporation, Terminal, no question of personal holding company would now be involved, for then substantially all of petitioner's income would have been denominated as "rent". * * * In substance, the creation of Terminal corporation by petitioner's stockholders created very little change in what these stockholders owned and, as a matter of fact, the management of each corporation was one *152 and the same. In fact, little necessity can be seen for two separate corporations. * * * We find little merit in petitioner's argument. We need not speculate as to what considerations led to the formation of Terminal in June 1949. Certainly some real or anticipated advantages must have appealed to the incorporators and we have been shown no compelling reasons or authority for this disavowal of such actions after a lapse of 8 years. The only issue now before us is whether payments [6] from Terminal to petitioner were interest or rents. If the latter, as urged by petitioner, then over 50 percent of its gross income was rent, excluded from personal holding company income by section 543(a)(7), and therefore petitioner was not a personal holding company as it would then fail to meet the 80 percent gross income requirement of section 542(a)(1). The payments in controversy were reported *153 on petitioner's income tax returns as interest income. These amounts, due from Terminal on the loans to it by petitioner, were treated on the latter's books as "Interest Receivable from Terminal" and "Notes Receivable, Indianapolis Produce Terminal" and such notes bore 7 percent interest. Petitioner argues that this "interest" was paid on a debt owed petitioner upon the sale of real property held by it for sale to customers in the ordinary course of its trade or business and therefore constitutes "rent" as defined by section 543(a)(7). However, it is clear that the 67.49 acres of land were exchanged for some of Terminal's common stock, and that the loans to it by petitioner were what gave rise to the "interest" payments at issue. It is clear to us that these payments were made as interest payments on loans, not as interest on a debt incurred in the purchase of real property, for it is stipulated that petitioner received 16,500 shares of Terminal's Class "A" common stock on January 15, 1954, in consideration for the realty. We also note that there is no evidence that the transferred acreage was ever held out by petitioner for sale to its customers in the ordinary course of its trade *154 or business. Petitioner has not attempted to explain why its books and tax returns denominate the payments by Terminal as interest. [7]
*155 Considering all of the above, we hold these payments to be interest, and it follows that "rents" do not constitute 50 percent or more of petitioner's gross income. Since more than 80 percent of petitioner's gross income for each taxable year at issue is personal holding company income as defined by section 543, it is subject to the personal holding company tax imposed by section 541. Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954.↩
2. So stipulated. No evidence was presented to explain how Terminal could grant a mortgage on property it did not yet own.↩
3. SEC. 542. DEFINITION OF PERSONAL HOLDING COMPANY. (a) General Rule. - For purposes of this subtitle, the term "personal holding company" means any corporation (other than a corporation described in subsection (c)) if - (1) Gross Income Requirement. - At least 80 percent of its gross income for the taxable year is personal holding company income as defined in section 543, and (2) Stock Ownership Requirement. - At any time during the last half of the taxable year more than 50 percent in value of its outstanding stock is owned, directly or indirectly, by or for not more than 5 individuals. * * * ↩
4. SEC. 541. IMPOSITION OF PERSONAL HOLDING COMPANY TAX. In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the undistributed personal holding company income (as defined in section 545) of every personal holding company (as defined in section 542) a personal holding company tax equal to the sum of - (1) 75 percent of the undistributed personal holding company income not in excess of $2,000, plus (2) 85 percent of the undistributed personal holding company income in excess of $2,000. ↩
5. SEC. 543. PERSONAL HOLDING COMPANY INCOME. (a) General Rule. - For purposes of this subtitle, the term "personal holding company income" means the portion of the gross income which consists of: (1) Dividends, Etc. - Dividends, interest, royalties (other than mineral, oil, or gas royalties or copyright royalties), and annuities. This paragraph shall not apply to interest constituting rent as defined in paragraph (7) or to interest on amounts set aside in a reserve fund under section 511 or 607 of the Merchant Marine Act, 1936. * * *
(7) Rents. - Rents, unless constituting 50 percent or more of the gross income. For purposes of this paragraph, the term "rents" means compensation, however designated, for the use of, or right to use, property, and the interest on debts owed to the corporation, to the extent such debts represent the price for which real property held primarily for sale to customers in the ordinary course of its trade or business was sold or exchanged by the corporation; but does not include amounts constituting personal holding company income under paragraph (6).↩
6. The exact amounts of these payments are not shown. The parties seem to agree that if the payments from Terminal were interest, petitioner was a personal holding company, and if they were rent, then over 50 percent of petitioner's gross income was rent and it was not a personal holding company.↩
7. The petition recites: * * * In May of 1952 it [petitioner] conveyed 67.49 acres of land to Indianapolis Produce Terminal, Inc., an Indiana corporation formed in June of 1949, in exchange for 16,500 shares of Indianapolis Produce Terminal, Inc. capital stock. Subsequent to this transfer, and in accordance with prearranged plans, cash loans were made to Indianapolis Produce Terminal, Inc. for the purpose of erecting terminal buildings and improvements, such loans being secured by a 7% mortgage note. * * * From its receipts, the bulk of which is rental income, Indianapolis Produce Terminal, Inc. has been refunding to petitioner the amounts advanced to it by petitioner. * * * The above pleading similarly indicates that the exchange of the real property for Terminal's stock was separate from the cash loans giving rise to the questioned "interest" payments, and that said payments were with respect to the loans and not with respect to the transferred realty. In addition, the minutes of a meeting of the directors of petitioner dated November 7, 1953, read in part: It was pointed out by Paul T. Rochford, that the corporation had advanced substantial sums of money to the Indianapolis Produce Terminal, Inc. It was moved by P. J. Caito, and seconded by Joe Murello, that the corporation take a second seven percent (7%) interest note of mortgage from the Indianapolis Produce Terminal, Inc., to cover all expenditures made by the corporation, with the provision that such mortgage note may be assigned to another firm or corporation as collateral for a loan to this corporation. Motion carried.↩